# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 16-1129V
## (to be published)

```
* * * * * * * * * * * * * * * * * * * * * * * *
CARY A. JOHNSON,                      *
                                      *        Special Master Oler
                                      *
           Petitioner,                *        Filed: September 4, 2019
                                      *
     v.                               *        Attorneys' Fees and Costs;
                                      *        Reasonable Basis
                                      *
SECRETARY OF HEALTH AND               *
HUMAN SERVICES,                       *
                                      *
           Respondent.                *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Amber Diane Wilson*, Maglio, Christopher and Toale, PA, Washington, D.C., for Petitioner.
*Heather Lynn Pearlman*, U.S. Department of Justice, Washington, D.C., for Respondent.

### DECISION ON FINAL ATTORNEYS' FEES AND COSTS[1]

On September 12, 2016, Cary Johnson ("Petitioner") filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program"),[2] alleging that she suffered from a multitude of injuries[3] as a result of her Afluria trivalent influenza ("flu")

---

[1] This Decision will be posted on the Court of Federal Claims' website. **This means the ruling will be available to anyone with access to the internet.** As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). If, upon review, I agree that the identified materials fit within this definition, I will redact such material from public access. Otherwise, the Decision in its present form will be available. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

[3] Specifically, Petitioner alleges that she developed the following twenty-six (26) injuries: a) vasculitis, b) left parietal occipital hemorrhage, c) acute right ACA (anterior cerebral artery) infarction, d) right parietal occipital intraparenchymal hematoma, e) headache, f) nausea and vomiting, g) instability, or a feeling of instability, when standing or walking, h) a gait disturbance (i.e., difficulty walking), i) speech impairment,

vaccination administered on October 8, 2014.[4]  Petition ("Pet."), ECF No. 1.  On November 28, 2017, Petitioner filed a Motion for a Decision Dismissing Petition (ECF No. 31); a decision dismissing the petition for insufficient proof was issued on November 29, 2017. ECF No. 32. Judgment was entered on January 10, 2018. ECF No. 36.

On July 6, 2018, Petitioner filed this Motion for Attorneys' Fees and Costs.[5]  Fees Application ("Fees App."), ECF No. 41.  Petitioner requests attorneys' fees for the work performed by Maglio Christopher and Toale, P.A. ("MCT") in the amount of $15,288.90, and costs in the amount of $3,259.02, totaling $18,547.92. *Id.*  Petitioner also requests attorneys' fees for the work performed by Ronan Law Firm ("RLF") in the amount of $20,620.00, and costs in the amount of $902.27, totaling $21,522.27.  Petitioner's counsel asserts that Petitioner incurred no costs in this case. *Id.*  Respondent opposes the motion and contends that Petitioner failed to establish a reasonable basis for her claim. Respondent's Response ("Resp't's Resp."), ECF No. 42.  For the reasons set forth herein, Petitioner's Motion for Attorneys' Fees and Costs is **GRANTED IN PART**.

## I.      Factual History

Petitioner was born on October 18, 1967. Ex. 8 at 9; *see generally* Ex. 4.  At the time of her flu vaccination on October 8, 2014, Petitioner was a 46-year-old woman with a history of hypertension, hyperlipidemia, and renal disorder. Ex. 1; Ex. 2 at 4.  Petitioner's history includes a 21-year history of smoking, though it is unclear if Petitioner currently smokes.

On October 12, 2014, Petitioner presented at the emergency department of St. Luke's North Hospital Barry Road ("SLHS-BR") in Kansas City, Missouri, complaining of severe headaches, nausea, and vomiting. Ex. 2 at 4.  Petitioner stated that, while she was at church, "she had a sudden onset of a frontal headache that quickly progressed to the back of her head," and that "she's never had a headache like this before." Ex. 2 at 6.   The records reflect Petitioner experienced some dizziness, loss of balance, and neck pain. *Id.*   While at the emergency department, several diagnostic tests were conducted. *See generally Id.*  Petitioner's laboratory tests and CT scan returned mostly normal results, with the exception of elevated CRP (C-reactive protein), AST (alanine aminotransferase), and ALT (aspartate aminotransferase). *Id.* at 9.   Additionally,

---

[4] j) decreased vision, k) cognitive impairment, l) reduced, divided attention skills, m) reduced visuospatial skills, n) executive function deficits, o) decreased fine motor coordination and dexterity, p) neck pain and stiffness, q) photophobia, r) dizziness, s) confusion, t) agitation, u) altered mental status, v) depression w) seizures, x) encephalitis, y) encephalopathy, and z) and other injuries. Petition at 7-8, ECF No. 1.

[4] This case was initially assigned to now-retired Special Master Hastings (ECF No. 3), reassigned to Special Master Corcoran on October 5, 2017 (ECF No. 28), and then reassigned to my docket on December 6, 2017 (ECF No. 33).

[5] Petitioner filed the attachments to her Motion for Fees Application as Exhibits 15-26.  For clarification, I will refer to Petitioner's motion as "Fees App." and cite to the page numbers of Petitioner's motion in accordance with the appropriate Exhibit number and the generated pagination.

Petitioner's CT contained a notation of "a small berry aneurysm [that] may be obscured." *Id.* Petitioner was released the same day with a diagnosis of migraine headaches and a prescription for Maxalt, hydrocodone, and Zofran. *Id.* at 8, 31-32.

On October 16, 2014, Petitioner presented to her primary care physician, Dr. Baskins. Petitioner had similar complaints of headaches on the day of the visit. Ex. 8 at 16. Dr. Baskins noted her emergency room visit from five days earlier. Additionally, Dr. Baskins noted that Petitioner "had her flu shot 9 days ago. Got sick after with vomiting and chills. Achy all over for days. Was just starting to feel better… when this headache started." *Id.* Furthermore, Dr. Baskins noted that "[Petitioner] is worried that she [sic] bad headache may be related to the flu shot."[6] *Id.* Despite the emergency department diagnosis, Dr. Baskins wrote that she was not certain of the migraine headache diagnosis since Petitioner did not have a history of migraines. *Id.* at 17-18. She recommended an MRI of brain, an MRA of brain and neck, and a possible rheumatology consultation to check for vasculitis. *Id.*

On October 19, 2014, Petitioner presented at the emergency department at SLHS-BR complaining of a sudden onset of headache at church. Ex. 2 at 53. Petitioner was examined, provided treatment for her symptoms, and released. *Id.* at 64.

On October 22, 2014, at approximately 1:30 a.m., Petitioner presented at the emergency department at SLHS-BR with a complaint of severe headache, nausea, and vomiting. *Id.* at 79. Records from that visit indicate that Petitioner informed the treating provider that her "symptoms started two weeks ago following receipt of the flu shot." *Id.* Petitioner was again treated for her symptoms and discharged. *Id.* at 82-83.

Petitioner was brought to the emergency department at St. Luke's North Hospital in Smithville (SLHS-S) several hours later with her husband and mother. Ex. 3 at 6. Petitioner's husband reported that Petitioner was confused and "not making any sense." *Id.* at 8. Petitioner presented with an "altered mental state" and was nonverbal. *Id.* Petitioner's husband provided the patient history, reporting "onset of her headaches 2 weeks ago about 3 hours after on her [sic] after a flu shot." *Id.* Petitioner is listed as a current every day smoker, and it is noted that the history was given fully by Petitioner's husband. *Id.* at 7. Petitioner was administered Ativan, at which point she relaxed and rested. *Id.* at 8. Arrangements were made to transfer Petitioner to SLHS-BR.

Petitioner arrived at SLHS-BR with family. Ex. 2 at 105. Petitioner underwent a CT, which showed an interval development of a 1.7 x 2.8 cm right parietal-occipital intraparenchymal

---

[6] Under "Medication Changes," Dr. Baskins' records indicate, both under old and new instructions, that "[Petitioner] has had significant adverse medical problems related to influenza vaccinations on 4 consecutive occasions." Ex. 8 at 21. It is not clear when the old instructions were implemented or to which "4 consecutive occasions" the notation is referring. There are no records indicating prior reactions to flu vaccinations. Dr. Baskins' records indicate that, prior to the October 8, 2014 flu vaccination, Petitioner refused receipt of the flu vaccine. Ex. 8 at 1, 4, 6, 20. Furthermore, there are no notations in Dr. Baskins' assessments of Petitioner after her October 22, 2014 hospitalization that refer to adverse reactions to the flu vaccination.

hematoma. Ex. 2 at 109.  Petitioner's results were communicated to her family and, in light of her continued unresponsiveness, arrangements were made for transfer to St. Luke's Hospital – Plaza at Kansas City (SLHS-KS) for further evaluation. *Id.*

Shortly after admission to SLHS-KS, Petitioner was intubated on October 23, 2014. Ex. 4 at 1092.  Intubation allowed for Petitioner to receive full treatment for seizures, which had been "conservative avoiding overseation… to preserve her mental status… This will allow more aggressive seizure management." *Id.*

On October 23, 2014, Petitioner underwent an MRI. Ex. 4 at 582.  MRI results showed that there was no change to the right parietal-occipital hemorrhage, but that there was a development of a similar hemorrhage on the left. *Id.* at 583.  Radiology records indicate a possible finding of posterior reversible encephalopathy syndrome ("PRES"), vasculitis, arterial infarction, or venous thrombosis. *Id.*  More clearly, an acute infarction within the right anterior cerebral artery ("ACA") was visible. *Id.*  Petitioner was prescribed Keppra for possible partial seizures arising from the infarct. *Id.* at 1092.

Petitioner's attending neurologist, Dr. Jason Day, diagnosed Petitioner with PRES and reversible cerebral vasoconstrictive syndrome ("RCVS") with cerebrovascular accident ("CVA"). Ex. 4 at 1083.  In leading to his diagnosis, Dr. Day considered a multitude of factors[7] and consulted with three other physicians, Drs. Martin, Holloway, and Cooper. *Id.*  Dr. Day went further to distinguish Petitioner's diagnosis from that of vasculitis, noting several factors which suggest a finding of RCVS.[8] *Id.*  In particular, Dr. Day also noted that Petitioner's Utox result, positive for cannabis, can be an indicator for RCVS.[9] *Id.* at 1084.

Petitioner also underwent a cerebral angiogram on October 23, 2014. Ex. 4 at 1042.  Radiology notes found findings to be "subtle and non-specific." *Id.*  The radiologist commented that "entities associated with this angiographic appearance include reversible cerebral vasoconstriction syndrome, CNS vasculitis, and encephalitis." *Id.*  A lumber puncture showing elevated white blood cell count and was negative for meningitis or encephalitis, and a CT scan confirming stable conditions were performed on October 24, 2014 and October 26, 2014, respectively. *Id.* at 1083; *see also id.* at 1033.

---

[7] Dr. Day considered the following factors for a diagnosis of RCVS: 1) HPI (recurrent thunderclap headache); 2) angiographic features; 3) MRI; and 4) exposure to vasospastic agents (Cannaboids and SSRI). Ex. 4 at 1083.

[8] Dr. Day diagnosed Petitioner with RCVS, and not vasculitis, after consideration of the following factors: 1) age; 2) sex; 3) HPI (vasculitis presents with dull onset); 4) UDS (urine drug test revealing cannabis) and SSRI (Prozac prescription); and 5) ICH/IPH (intracerebral/intraparenchymal hemorrhage) alongside ischemic CVA. Ex. 4 at 1083.

[9] According to Dr. Day, 30% of patients that patients diagnosed with RCVS have exposure to cannabis.

Several consultations were made to confirm Petitioner's condition, treatment, and diagnosis. *See generally* Ex. 4. An infectious disease consult found "no evidence of an infectious problem." *Id.* at 1064. Rheumatology consultation confirmed Dr. Day's diagnosis of PRES/RCVS. *Id.* at 1069. In fact, rheumatology found that Petitioner's "age, sex, kinetics of illness (sudden severe headache), presence of vasospastic agents and LP all favor diagnosis of reversible cerebral vasoconstriction syndrome rather than primary CNS vasculitis." *Id.* at 1070.

On October 28, 2014, Petitioner's condition was reviewed by Dr. Olds from neurology. *Id.* at 1184. Dr. Olds expressed hesitation in a diagnosis between RCVS and vasculitis but recommended adding treatment for vasculitis. *Id.* She further noted that Petitioner had been given DHE (dihydroergotamine) prior to the alteration in her mental state. *Id.* Petitioner was extubated on October 29, 2014. *Id.* at 1166.

On November 3, 2014, Petitioner's condition had improved, and she was discharged. *Id.* at 1033. Petitioner's discharge diagnosis was recorded as an ischemic CVA, and her hospital stay was summarized. *Id.*

Petitioner presented to Dr. Baskins, her primary care physician, on November 6, 2014. Ex. 8. Dr. Baskins noted a higher level of ESR (erythrocyte sedimentation rate), but stated this finding was expected given a consideration of vasculitis. *Id.* at 30. Dr. Baskins did not discuss Petitioner's hospital diagnoses and did not provide any additional comments regarding Petitioner's October 8, 2014 flu vaccination.

On November 7, 2014, Petitioner presented to the Moyes Eye Center. Ex. 7 at 7. Petitioner had partial left inferior quadrant defect in both eyes following, and consistent with, stroke.[10] *Id.* at 9-10.

On November 24, 2014, Petitioner presented for a neurology follow-up to Dr. Suzanne Crandall. Ex. 5 at 3. Dr. Crandall noted that Petitioner was able to conduct daily activities independently and that she was attending speech and occupational therapy two times per week. *Id.* She also expressed that Petitioner had not returned to driving due to her vision and seizure medication. *Id.* After reviewing Petitioner's records and conducting an examination, Dr. Crandall provided in her assessment that "there is a suspected diagnosis of reversible cerebral vasoconstriction syndrome" *Id.* at 5. She further considers RCVS in her determination of a care plan for Petitioner. *Id.* Dr. Crandall also suggested that Petitioner consider returning to work. *Id.*

Between November 20, 2014, and December 16, 2014, Petitioner attended five sessions of occupational therapy, canceled two sessions, and did not show for four sessions. Ex. 6 at 100. Specifically, Petitioner did not show for the last three sessions, and occupational health was not able to retest Petitioner's long-term goals. *Id.* at 101. The discharge notes further state that Petitioner would "benefit from further skilled therapy," and that, due to Petitioner's missed

---

[10] Moyes Eye Center listed Petitioner's flu shot under the allergies section of patient history, with the following comment in quotation: "almost killed her." Ex. 7 at 7.

5

sessions, they were "unable to provide further guidance regarding return to driving and return to work skills." *Id.*

On February 18, 2015, Petitioner underwent MRI and MRA testing. Ex. 8 at 52-53.  In comparison to Petitioner's October 23, 2014 MRI, the results showed an evolution of hemorrhagic products with a slight decrease in hematomas and no evidence of an acute intracranial hemorrhage. *Id.* at 53.  Petitioner's MRA results were normal except for a possible left ICA aneurysm, identified in Petitioner's previous cerebral angiogram. *Id.* at 52.

On March 8, 2016, Petitioner visited her primary care physician for a follow-up appointment. *Id.* at 58.  Petitioner stated to Dr. Baskins that she occasionally gets dull headaches on her left side, and that she "fatigues easier" and "sleeps more than she used to." *Id.*  On March 30, 2016, Petitioner underwent MRI and MRA testing. *Id.* at 147, 152.  Petitioner's MRA results were unchanged from the previous year's results. *Id.* at 147.  Petitioner's MRI results included an impression of "stable areas of chronic encephalomalacia and chronic hemosiderin staining involving bilateral occipital lobes compatible with chronic sequela of prior intraparenchymal hemorrhage." *Id.* at 152.

On October 14, 2016, Petitioner reported to Dr. Baskins for a follow-up. Ex. 8 at 63. Dr. Baskins noted that Petitioner still suffered from muscle fatigue, cognitive issues, and poor memory. *Id.*  She recommended to Petitioner that she not return to work as a nurse and that she receive a neuropsychology evaluation. *Id.* at 64.  In light of Dr. Baskins' recommendation, Petitioner underwent a neuropsychology evaluation with Mr. Christopher Evans at Noll Psych Group on November 15, 2016. Ex. 12 at 1.  Mr. Evans concurred with Dr. Baskins' recommendation that Petitioner not return to work as a registered nurse but suggested that she engage in other group or social activities. *Id.* at 8.

## II.    Procedural History

Petitioner contacted Mr. William P. Ronan, III, of RLF on November 30, 2014, less than two months after her October 8, 2014 flu vaccination.  For the next two years, Mr. Ronan and his paralegal worked on Petitioner's case, obtaining records and reviewing Petitioner's claim, before filing the petition.  Mr. Ronan requested medical records from North Kansas City Hospital, St. Luke's Medical Group, Mast Ambulance, St. Luke's Smithville, St. Luke's Plaza, St. Luke's Occupational and Speech Therapy, Moyes Eye Center, and St. Luke's Outpatient Rehabilitation.[11] Ex. 17 at 1-3.  Counsel also conducted research on the following topics: 1) "prevalent vaccine and thrombo embolic-events"; 2) "flu vaccine and vasculitis"; 3) "ANCA"; and 4) "Reversible Cerebral Vasoconstriction Syndromes, Posterior Reversible and Vasculitis."[12]  Furthermore, Mr.

---

[11]  The records were requested at or around the following dates, respectively: 12/05/2014, 1/09/15, 1/09/2015, 1/09/15, 1/09/2015, 1/09/2015, 5/8/2015, and 5/08/2015. Ex. 17 at 1-3.  The dates the records were received were not documented.

[12]  The research on these topics was conducted on the following days, respectively: 4/17/2015, 8/25/2015, 8/28/2015, and 9/09/2015. Ex. 17 at 3.

Ronan contacted six (6) potential experts in February and March of 2016. (Dr. Greetha, Dr. Duggal, Dr. Segal, Dr. Shah, Dr. Manoharan, and Dr. Carter-Monroe). Ex. 17 at 3-4.

On September 12, 2016, nearly two years after contacting her attorney, Petitioner, through her attorney, filed her Petition with the Vaccine Program and a Notice of Intent to File on Compact Disc. ECF No. 1.  On September 14, 2016, the case was assigned to then Special Master Hastings, and he issued an initial order. ECF No. 3; ECF No. 4.  Petitioner filed a statement of completion on September 21, 2016. ECF No. 5.

On October 20, 2016, Respondent filed a status report, highlighting missing records. ECF No. 8.  Specifically, Respondent requested that Petitioner file records from "primary care physician(s) and/or any sub-specialists in the three years prior to vaccination." *Id*.  Petitioner requested and filed records from her primary care physician, Dr. Baskins, and, on December 9, 2016, represented that all such records had been filed. ECF No. 12; *see generally* ECF No. 11.

Respondent filed his Rule 4(c) Report ("Resp't's Report, ECF No. 14) on January 27, 2017, stating that "[P]etitioner has failed to submit preponderant evidence establishing the specific injury that she claims was caused by the influenza vaccine." Resp't's Report at 13.  Furthermore, Respondent noted that "[P]etitioner has yet to offer a reputable scientific or medical theory establishing that the trivalent influenza vaccine either can cause [P]etitioner's various ailments (general causation), or that it did so in her case (specific causation)." *Id*.  Respondent recommended that the petition be dismissed. *Id*. at 14.

On January 30, 2017, Petitioner was ordered to seek an expert opinion in support of her claims. ECF No. 15.  In February 2017, Mr. Ronan made several additional attempts to secure a medical opinion by contacting four additional named experts (Dr. Fisher, Dr. Sheth, Dr. Rordorf, and Dr. Dubinsky).  Ex. 17 at 5.  Instead of filing her expert report on the ordered deadline, however, Petitioner filed for her first extension of time on March 22, 2017. ECF No. 16.

On April 3, 2017, Petitioner filed a Consented Motion to Substitute Attorney Anne C. Toale of MCT in place of Mr. Ronan. ECF No. 18.  Petitioner, now through Ms. Toale, proceeded to file a second Motion for Extension of Time on May 30, 2017, requesting an additional ninety (90) days to file Petitioner's expert report. ECF No. 21.  In the Motion, Petitioner represented that a tentative expert had been retained. *Id.*

Mr. Ronan filed a Motion for Interim Attorneys' Fees on July 27, 2017. ECF No. 23. Respondent issued a brief response on August 22, 2017, stating that he deferred to "the discretion of the Special Master to determine whether the statutory and other legal requirements for an interim award of attorneys' fees and costs are met in this case." ECF No. 25 at 2.

Petitioner filed her third request for an extension of time to file an expert report on August 28, 2017, representing that the appropriate MRI and CT images, filed as Exhibits 10 and 11, were sent to the expert. ECF No. 26.  Petitioner requested an additional sixty (60) days to file her report.

On October 26, 2017, Petitioner filed her fourth Motion for Extension of Time, stating that the conclusions of the expert had now been communicated to Petitioner. ECF No. 30.  In this fourth request, Petitioner asked for an additional sixty (60) days to submit her expert report.  Special Master Corcoran held a status conference on November 06, 2017, before granting, in part, Petitioner's request. *See* Non-PDF Order of 11/06/2017.

Less than a month later, Petitioner filed her Motion to Dismiss her Petition on November 28, 2017. ECF No. 31.  A Decision Dismissing the Case for Insufficient Proof was issued by Special Master Corcoran on November 29, 2017. ECF No. 32.  This case was assigned to my docket on December 6, 2017 (ECF No. 34); judgment was entered on January 10, 2018. ECF No. 36.

On March 20, 2018, Mr. Ronan filed a Motion for Leave to File Standing to Resolve Attorneys' Fees and Costs. ECF No. 38.  In that Motion, Mr. Ronan detailed the work his firm has performed in this case prior to the substitution of MCT and requested standing to file his request for attorneys' fees. *Id*.  I issued an Order on April 11, 2018, denying his motion for standing. ECF No. 39.  In that Order, I clarified that only the attorney of record, then Ms. Anne Toale, may file in this case. *Id* at 2.  I further addressed the outstanding Motion for Interim Attorneys' Fees, filed on July 24, 2017, finding that a consideration of interim fees was no longer appropriate. *Id*.  I directed Mr. Ronan to submit his fees invoice to the attorney of record in this case.

On July 6, 2017, a Motion for Final Fees was filed by Petitioner through her counsel of record, now Ms. Amber Wilson of MCT. ECF. No. 41.  Respondent filed his response to that Motion on July 20, 2018, asserting that "[P]etitioner has failed to establish a reasonable basis for her petition and is therefore not entitled to receive a discretionary attorneys' fees and costs award." Resp't's Resp. at 1, ECF No. 42.  In support of his position, Respondent argues that "[P]etitioner failed to submit preponderant evidence establishing the specific injury that she claimed was caused by the influenza vaccine," and that Petitioner's asserted onset of her injuries is not temporally appropriate to suggest causation. *Id*. at 4-5.  Petitioner submitted a lengthy reply ("Pet'r's Reply") to Respondent's Response on July 27, 2018, asserting that "Petitioner possessed a reasonable basis when filing her claim." Pet'r's Reply at 7, ECF No. 43.  Petitioner asserts that the evidence submitted supported a feasibility of the claims, though admitting that the "medical record… offers evidence both for and against vaccine causation of her associated injuries." *Id*.

I held a status conference on February 12, 2019. *See* Minute Entry for 2/19/2019; *see also* ECF No. 45.  During that conference, I inquired whether Petitioner could provide further information regarding the case transfer process. ECF No. 45.  Specifically, I questioned counsel's decision to take Petitioner case from Mr. Ronan even after numerous attempts to obtain an expert report had proved fruitless. *Id*.

On February 21, 2019, Petitioner filed a response to my order, as well as an affidavit from Mr. Ronan.  Ms. Wilson represented that Petitioner and Mr. Ronan sought MCT's assistance in finding an expert. ECF No. 47.  After case transfer, MCT sought to acquire a substantive review of Petitioner's medical records before dismissing the case. *Id*.  Mr. Ronan further added that he

had not been able to acquire a substantive expert review of Petitioner's case, despite his numerous attempts. Ex. 27.

The matter of final attorneys' fees and costs in this case is now ripe for a decision.

## III.      Parties' Arguments

While Respondent has no objection that the petition was filed in good faith, Respondent argues that "Petitioner's claim never possessed a reasonable basis." Resp't's Resp. at 4. Respondent notes that Petitioner's previous attorney, Mr. Ronan, had worked on this case for two years prior to filing the petition, and that Petitioner requested four extensions of time to acquire an expert opinion prior to moving for a dismissal of her case. *Id*. at 2.  Respondent states that "a special master may not award compensation 'based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.'" *Id*. at 3 (citing 42 U.S.C. § 300aa-13(a)(1)).  Respondent further states that in order for a claim to have a reasonable basis, such claim must, "at a minimum, be supported by medical records or medical opinion." *Id*. at 3 (citing *Everett v. Sec'y of Health & Human Servs.*, No. 91-1115V, 1992 WL 35863, at *2 (Cl. Ct. Spec. Mstr. Feb. 7, 1992)).  Citing *Simmons v. Sec'y of Health and Human Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017), Respondent adds that establishing reasonable basis is dependent on the "evidentiary support for the claim set forth in the petition." *Id*. at 4.  In assessing the application of *Simmons*, Respondent argues that Petitioner has not provided sufficient evidence in her records to support reasonable basis for filing her claim. *Id*.  In addition to the lack of evidence, Respondent reiterates that the medical records reflect a symptom onset of just three hours following the administration of the flu vaccine.[13]

Petitioner replied to Respondent's Response on July 27, 2018. Pet'r's Reply.  Petitioner offered the following arguments in support of a reasonable basis: (1) Petitioner's medical records contain numerous notations of an allergy to flu vaccination; (2) Petitioner's treating physicians recommend that Petitioner not receive future flu vaccinations; (3) other special masters have found vaccine causation for Petitioner's alleged injuries; and (4) reasonable basis can be found without offering expert opinions in support of vaccine causation. *See generally id.*  While Petitioner did not directly address Respondent's argument that onset occurred within three hours of vaccination, Petitioner included that her records reflect her "symptoms started two weeks ago following receipt of the flu shot."[14] *Id*. at 10.  Petitioner asserted that "[r]easonable basis… requires a demonstration of a viable or feasible claim," and that Petitioner's medical records evidenced such a claim at the time of filing. *Id*. at 14.  Petitioner added that reasonable basis was maintained while her counsel obtained medical records and consulted experts and through the time when the viability of the claim was revealed, and the petition was subsequently dismissed. *Id* at 15.

---

[13] In his Resp't's Report, Respondent argued that the medical records reflected a statement by Petitioner's husband that asserted an onset of headaches at three hours following vaccination.  This onset, Respondent argues, is not temporally feasible to suggest vaccine causation.

[14] This notation was made on October 22, 2014. Ex. 2 at 79.  I note that this statement in the record would also place symptom onset at October 8, 2014, the date of Petitioner's flu vaccination.

## IV.     Applicable Law

Under the Vaccine Act, an award of reasonable attorneys' fees and costs is mandatory where a Petitioner is awarded compensation; where compensation is denied, as it was in this case, the special master must first determine whether the petition was brought in good faith and whether the claim had a reasonable basis. § 15(e)(1).

The good faith requirement is met through a subjective inquiry. *Di Roma v. Sec'y of Health & Human Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Such requirement is a "subjective standard that focuses upon whether [a] petitioner honestly believed he [or she] had a legitimate claim for compensation." *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Thus, so long as Petitioners had an honest belief that their claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Human Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

Regarding the reasonable basis requirement, it is incumbent on Petitioners to "affirmatively demonstrate a reasonable basis," which is an objective inquiry. *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 297, 305 (2011); *Di Roma*, 1993 WL 496981, at *1. When determining if a reasonable basis exists, many special masters and U.S. Court of Federal Claims judges employ a totality of the circumstances test.[15] The factors to be considered under this test may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, No. 17-36V, 2018 WL 3032395, at *7 (Fed. Cl. June 4, 2018). This "totality of the circumstances" approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Human Servs.*, No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

The Federal Circuit has emphasized that reasonable basis "is an objective inquiry" and concluded that "counsel may not use [an] impending statute of limitations deadline to establish a reasonable basis for [appellant's] claim." *See Simmons,* 875 F.3d 632 at 636. In interpreting *Simmons*, some judges have determined that an impending statute of limitations should not even be one of several factors the special master considers in her reasonable basis analysis. "[T]he Federal Circuit forbade, altogether, the consideration of statutory limitations deadlines—and all

---

[15] Judges on the U.S. Court of Federal Claims have affirmed instances when the special master employed this test or have remanded a decision when the special master did not. *Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 288 (2014); *Graham v. Sec'y of Health & Human Servs.*, 124 Fed. Cl. 574, 579 (2015); *Rehn v. Sec'y of Health & Human Servs.*, 126 Fed. Cl. 86, 91-92 (2016); *Allicock v. Sec'y of Health & Human Servs.*, 128 Fed. Cl. 724, 726 (2016); *Cottingham v. Sec'y of Health & Human Servs.*, 134 Fed. Cl. 567, 574 (2017).

conduct of counsel—in determining whether there was a reasonable basis for a claim." *Amankwaa*, 2018 WL 3032395, at *7.

Unlike the good faith inquiry, reasonable basis requires more than just Petitioners' belief in their claim. *See Turner*, 2007 WL 4410030, at *6. Instead, the claim must at least be supported by objective evidence -- medical records or medical opinion. *Sharp-Roundtree v. Sec'y of Health & Human Servs.*, No. 14-804V, 2015 WL 12600336, at *3 (Fed. Cl. Spec. Mstr. Nov. 3, 2015). The evidence presented must be "sufficient to give the petitioner a reasonable expectation of establishing causation." *Bekiaris v. Sec'y of Health & Human Servs.*, No. 14-750V, 2018 WL 4908000, at *6 (Fed. Cl. Spec. Mstr. Sep. 25, 2018). Temporal proximity between vaccination and onset of symptoms is a necessary component in establishing causation in non-Table cases, but without more, temporal proximity "fails to establish a reasonable basis for a vaccine claim." *Id; see also Chuisano*, 116 Fed. Cl. at 287.

Although "special masters have historically been quite generous in finding reasonable basis for petitions," *Turpin v. Sec'y of Health & Human Servs.*, No. 99-564V, 2005 WL 1026714, at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005); *see Turner*, 2007 WL 4410030, at *6-7, the court expects counsel for Petitioner to make a pre-filing inquiry into the claim to ensure that it has a reasonable basis. *See Turner*, 2007 WL 4410030, at *6-7.

However, even if reasonable basis exists at the time the petition is filed, it "may later come into question if new evidence becomes available or the lack of supporting evidence becomes apparent." *Chuisano*, 116 Fed. Cl. at 288; *see also Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994) (affirming the special master's finding that reasonable basis existed until the evidentiary hearing); *Hamrick*, 2007 WL 4793152, at *4 (observing that "Petitioner's counsel must review periodically the evidence supporting [P]etitioner's claim").

## V.   Analysis

### A.   Good Faith

Petitioner is entitled to a presumption of good faith, and Respondent does not contest that the petition was filed in good faith. *Grice*, 36 Fed. Cl. at 121. There is no evidence that this petition was brought in bad faith. Thus, I find that the good faith requirement is satisfied.

### B.   Reasonable Basis for the Claims in the Petition

The reasonable basis standard is objective and requires Petitioner to submit some evidence in support of "the claim for which the petition was brought." § 15(e). The petition in this case alleges that Petitioner received the flu vaccine on October 8, 2014, and thereafter suffered from headaches, nausea, vomiting, and a multitude of other injuries (*see* footnote 3) that arose from her initial symptoms. *See generally* Pet. Petitioner states that her flu vaccination caused or contributed to Petitioner's numerous injuries. *Id*. at 7.

Petitioner highlights the following evidence in support of a reasonable basis for filing the petition: (1) Petitioner's medical records contain numerous notations of an allergy to the flu vaccination; (2) Petitioner's treating physicians recommend that Petitioner not receive future flu vaccinations; (3) other special masters have found vaccine causation for Petitioner's alleged injuries; and (4) reasonable basis can be found without offering opinions in support of vaccine causation. *See generally* Pet'r's Reply. After my careful study of the record and as discussed in more detail below, I do not find the majority of the claims articulated in the petition to be supported by objective evidence. I do, however, find that the notations by Petitioner's primary care provider, Dr. Baskins, reflecting a possible adverse reaction to the flu vaccine, and the considerations of a vasculitis diagnosis in the medical records provide some minimal evidence in support of further investigating Petitioner's claims. Therefore, I find that reasonable basis was established at the time of filing.

      1.  <u>Evidence and Arguments Presented by Petitioner Provide Support for a Finding of Reasonable Basis</u>

Petitioner avers that the notations in her medical records, the recommendations by treating physicians, and special master findings of vaccine causation of vasculitis and encephalitis support "a vaccine injury" and thus establish reasonable basis to file the petition. I find that Petitioner met her burden in producing some evidence in support of her claim, thereby establishing reasonable basis for filing her Petition.

      i.  *Medical Records and Recommendations of Treating Physicians*

Petitioner argues that several of her treating physicians and specialists, as well as her primary care physician, have asserted vaccine causation of her injuries and noted as such in her medical records. To provide a few examples, Petitioner's emergency visit notes from October 22, 2014, have a notation of the receipt of flu shot under patient history. Ex. 2 at 79 ("Symptoms started two weeks ago following receipt of the flu shot."). In the same report, however, the exact same notation was included in quotation marks, indicating the patient's direct dictation. Ex. 2 at 82 ("Pt reports to the ER tonight with c/o ongoing headache that started approx. 2 weeks ago 'after she had the flu shot.'"). The flu vaccination is also listed as an allergy on many of her records from her October 12, 2014 and October 22, 2014 visits to St. Luke's Health System.[16] *See generally* Ex. 2, 4. Records from Petitioner's visit to the Moyes Eye Center list the flu vaccine, under allergies, as having "almost killed her," but this notation also included quotation marks, signifying a direct quote from the patient when taking history. Finally, Petitioner's primary care physician makes several references to the flu vaccination. *See generally* Ex. 8. Of note, Dr.

---

[16] These notations were not originally included during Petitioner's visits on those dates but were updated on November 1, 2014. *See generally* Ex. 2, 4. The sections appear to be identical on each report and, therefore, it is likely that a single update to Petitioner's electronic medical profile updated all the sections accordingly. The potential of the flu vaccine as a cause or an allergy was not discussed, however, by any of Petitioner's treating physicians or specialists.

Baskins recorded on October 16, 2014, that "[Petitioner] has had significant adverse medical problems related to influenza vaccination on 4 consecutive occasions." Ex. 8 at 21.

While it is true that there are several references to Petitioner's October 8, 2014 flu vaccination in the medical records, the notations are always a part of Petitioner's provided history and none of Petitioner's treating physicians, with the exception of Dr. Baskins, attributed her symptoms or injuries to the flu vaccine. Given the appearance of the flu vaccination in the patient history sections (suggesting that the implication of a possible vaccine causation was frequently introduced by Petitioner or her family), the distinct lack of discussion regarding the flu vaccination as a possible cause is demonstrative of the treating physicians' considerations regarding causation. Moreover, the purposeful use of quotations in several instances suggests the intention of the treating physician to attribute the notation only to Petitioner. Though Petitioner's treating physicians from her hospital visits often noted her flu vaccination in the patient-provided history, no provider discussed the flu vaccine in their impressions and treatment plans or considered the possibility of vaccine causation.

Dr. Baskins' notation from October 16, 2014, however, references four previous occasions of adverse medical problems due to flu vaccination. Ex. 8 at 21. While there is no indication in the records of these other incidents, the notation itself suggests that Petitioner's primary care provider considered that the flu vaccine may have caused Petitioner adverse reactions. Additionally, Dr. Baskins' noted that Petitioner "may not take an influenza vaccination again due to severe reaction." *Id.* at 20. This notation goes beyond a recitation of history provided by Petitioner and indicates that Dr. Baskins attributed Petitioner's symptoms to her flu vaccine. I find that Dr. Baskins' notations provide some evidence on which Petitioner can base her claim that reasonable basis has been established.

ii.    *Special Master Findings of Causation*

Petitioner contends that since other special masters have found causation between the flu vaccination and vasculitis or encephalitis, Petitioner possessed reasonable basis when filing her claim. Petitioner states that, at the time of discharge, her diagnosis was unclear. Without further medical opinion, Petitioner asserts that a diagnosis of vasculitis or encephalitis may be plausible. In light of a possible vasculitis or encephalitis diagnosis, Petitioner argues that her claim alleging vaccine causation was a feasible one.

Though Petitioner's records generally indicate that Petitioner was diagnosed with posterior reversible encephalopathy syndrome and reversible cerebral vasoconstrictive syndrome following a cerebrovascular accident, there are a few records indicating the possibility of vasculitis. Ex. 4 at 1069, 1083. Petitioner's attending neurologist, after consulting with three other physicians and considering a multitude of factors, arrived at Petitioner's diagnosis of RCVS following an ischemic CVA. Ex. 4 at 1083. This diagnosis was then confirmed by a rheumatology consultation, intended to rule out vasculitis. Ex. 4 at 1069. However, impression notes mentioning RCVS were at times, coupled with considerations of possible vasculitis. Ex. 4 at 1033, 1044, 1184. Dr. Olds, a neurologist from Petitioner's hospital stay, was reluctant to rule out vasculitis and proceeded to add treatment for vasculitis. Ex. 4 at 1184. During a follow-up appointment, Dr. Baskins'

considered the possibility of vasculitis given Petitioner's higher ESR level. Ex. 8 at 30.  There were also minimal considerations of encephalitis, although lumbar puncture was negative for encephalitis, and no final findings by treating physicians diagnosed Petitioner with encephalitis.[17] Ex. 4 at 1033, 1042.  Even after such considerations, an infectious disease consult eventually found "no evidence of infectious problem." Ex. 4 at 1064.  Therefore, though the diagnoses of vasculitis and encephalitis were ultimately discarded by treating physicians, the records considering these diagnoses suggest that it was reasonable for Petitioner to retain an expert to explore this issue.

### 2.  Onset Interval

Petitioner must present a likelihood of a medically-appropriate temporal onset of symptoms to suggest a finding of reasonable basis.  In order to find vaccine causation, the temporal interval between the flu vaccination and the onset of symptoms must be medically feasible.  "Cases in which onset is too soon" fail to establish a medically feasible temporal relationship between the vaccination and the injury, thereby rendering a petitioner's claim untenable. *See De Bazan v. Sec'y of Health and Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008).  Special Masters have continuously found that an onset of less than two days is a medically inappropriate time frame for symptom onset of immune-regulated responses following flu vaccination. *See generally id*.

Based on the medical records and the detailed statements of Petitioner's husband, I find that Petitioner's symptom onset is likely between three hours and four days after her flu vaccination.  Petitioner's husband provided her patient history at the emergency visit on October 22, 2014, "reporting onset of her headaches 2 weeks ago about 3 hours after on [sic] her after a flu shot." Ex. 3 at 5.  Petitioner herself asserts that the medical records reflect notations indicating that her "symptoms started two weeks ago following receipt of the flu shot," placing onset at October 8-9, 2014. Ex. 2 at 79; *see also* Pet'r's Reply at 10.

Conversely, on October 16, 2014, Petitioner provided a chronology of events for Dr. Baskins: "46 year old white female who comes in with sudden onset of headache 5 days ago at church. … Had her flu shot 9 days ago.  Got sick after with vomiting and chills.  Achy all over for a few days.  Was just starting to feel better from this when the headache started." Ex. 8 at 16. Based on these records, onset of Petitioner's headache began four days after her flu vaccination. While Petitioner does not posit this argument, I believe the medical records provide some evidence of an onset interval of four days.  Accordingly, I am not persuaded by Respondent's insistence that a finding of reasonable basis must be ruled out based on the issue of onset.

Based on the evidence in the medical records, I find there was a reasonable basis to file the petition because of Dr. Baskins' assessment that Petitioner could no longer receive flu vaccinations and the consideration, however briefly, of a vasculitis or encephalitis diagnosis by Petitioner's treating physicians.

---

[17] Encephalitis is listed in the findings section of the report but is not listed as an actual finding. Ex. 4 at 1042.  Rather, the post-radiology notes suggest that "entities associated with this angiographic appearance include reversible cerebral vasoconstriction syndrome, CNS vasculitis and encephalitis." *Id.*

## VI.   Awarding Attorneys' Fees and Costs

As reasoned above, I find that Petitioner established reasonable basis to file her petition. On February 12, 2019, I held a status conference to determine whether reasonable basis had been maintained through dismissal of Petitioner's claims. *See* Minute Entry of 2/19/2019.  Specifically, I questioned Petitioner's counsel on whether there was reasonable basis for MCT to continue prosecution of the petition after RLF had attempted and failed numerous times to acquire an expert.

In her response to my Order (*see* ECF No. 45), Petitioner represented that RLF had not been able to procure a substantive review of the medical records. ECF No. 47 at 2.  MCT continued prosecution of the petition in order to obtain a substantive review; once an expert review proved unable to support Petitioner's case, Petitioner moved to dismiss the petition.  *Id*. at 7.

I find that it was reasonable for Petitioner to seek a *substantive* expert review of her medical records until one could be obtained.  Once Petitioner received a negative review of her claims, she filed her motion for a dismissal decision.  Accordingly, I find that reasonable basis was maintained throughout the pendency of the matter, and I award Attorneys' Fees and Costs to both RLF and MCT.

### A.   Reasonable Attorneys' Fees for RLF

As discussed in detail above, Petitioner established that there was a reasonable basis at the time of filing her Petition.  In her Fees App., Petitioner requested a total of $20,620.00 in attorneys' fees, and $902.27 in attorneys' costs, for RLF.

#### 1.   Requested Hourly Rates

Petitioner requests compensation for her attorney, Mr. William P. Ronan, III, and his paralegal, both members of RLF. Ex. 17 at 6; *see generally* Fees App.  Petitioner requests the following hourly rates for work performed by each member of the firm from 2014 to 2017:

|      | Mr. Ronan | Paralegal |
|------|-----------|-----------|
| 2014 | $400.00   | $100.00   |
| 2015 | $400.00   | $100.00   |
| 2016 | $400.00   | $100.00   |
| 2017 | $400.00   | $100.00   |

#### 2.   Hourly Rates Awarded

Mr. Ronan's requested hourly rated for work performed between 2014-2017 have been previously found to be reasonable and awarded by other Special Masters and will be awarded in full in this present case.  RLF's paralegal hourly rate of $100.00 has been previously awarded and is well within the range of hourly rates awarded to paralegals by this Program.  I similarly find it to be reasonable in this case.

15

Accordingly, Petitioner's requested hourly rates for Mr. Ronan and his paralegal are awarded in full.

### 3. Reduction of Billable Hours

Based on my review of the billing records submitted with Petitioner's Fees App., I find that RLF billed hours that I consider "excessive, redundant, or otherwise unnecessary." *Saxton v. Sec'y of Health and Human Servs.*, 3 F.3d at 1521 (Fed. Cir. 1993). For example, the time entries submitted by RLF reflect that Mr. Ronan and/or his paralegal billed excessive time for tasks such as filing or reviewing filings. Mr. Ronan also included entries that were seemingly duplicative in nature.[18] Moreover, many of the billing entries also reflect instances of vague task descriptions.[19]

For these reasons, I will reduce the total award of Petitioner's requested attorneys' fees by 10%. A 10% reduction[20] results in a reduction of Petitioner's Vaccine Act attorneys' fees award to **$18,558.00**.

Therefore, Petitioner is awarded attorneys' fees in the amount of **$18,558.00**.

## B. Reasonable Attorneys' Costs for RLF

Petitioner requests a reimbursement of $902.27 in attorneys' costs for RLF. Ex. 17 at 6. The requested costs herein are miscellaneous case costs and appear to be reasonable. Therefore, I award Petitioner her requested attorneys' costs for RLF in full, totaling **$902.27**.

## C. Reasonable Attorneys' Fees for MCT

In her Fees App., Petitioner requested a total of $15,288.90 in attorneys' fees, and

---

[18] For example, the following billing entries reflect attorneys and/or paralegals of RLF billing multiple times for one task: (1) several "revise notice of filing" entries in a row (*see* 12/20/2016-12/07/2016); (2) "memo to file" entries; and (3) "revise Petition" (this notation appeared at least 25 separate occasions, several times in blocks). Ex. 17 at 1-5.

The billing entries mentioned above are examples and are not exhaustive; they provide a mere sampling of the excessive and duplicative tasks in Mr. Ronan's billing invoice.

[19] *See generally* Ex. 17 at 1-5. Vague billing entries include references to "memo to file," "revise" a document, and "phone call to client". *Id.* Mr. Ronan usually provided very little description in each of his billing entries, making it unclear as to the work performed or completed.

[20] 

| Attorneys' fees requested | = | $20,620.00 |
|---|---|---|
| **Percentage of reduction (10%)** | = | 0.90 |
| **Billable Hour Reduction Amount** | **=** | **$18,558.00** |

16

$3,259.02 in attorneys' costs, for MCT.

### 1. Requested Hourly Rates

Petitioner requests compensation for her attorneys and paralegals of MCT. Ex. 15 at 13; *see generally* Fees App. Petitioner requests the following hourly rates for work performed by each attorney of the firm in 2017 and 2018:

|  | **Mr. Altom Maglio** | **Ms. Amber Wilson** | **Ms. Anne Toale** | **Ms. Danielle Strait** | **Ms. Jessica Ollins** |
|---|---|---|---|---|---|
| **2017** | n/a | $290.00 | $378.00 | n/a | n/a |
| **2018** | $381.00 | $308.00 | $402.00 | $322.00 | $184.00 |

Petitioner also requests that paralegals of MCT be compensated for work performed from 2017-2018 at rates varying from $145.00 per hour to $148.00 per hour, based on the year and the individual paralegal. *See* Ex. 15 at 13.

### 2. Hourly Rates Awarded

The requested hourly rates for work performed by MCT attorneys in 2017 and 2018 have been previously found to be reasonable by several special masters and, therefore, will be awarded in full.

MCT's paralegal hourly rates range, as listed above, has been previously found reasonable. *See Ritchie v. Sec'y of Health & Human Servs.*, No. 16-514V, 2018 WL 2224203 (Fed. Cl. Spec. Mstr. Mar. 23, 2018). Accordingly, I award the requested hourly rates for MCT paralegals in full.

Therefore, Petitioner's requested hourly rates for MCT attorneys and paralegals are awarded in full.

### 3. Reduction of Billable Hours

Petitioner requested a total of $11,597.00 for the work completed by MCT attorneys and $3,691.90 for the work completed by MCT paralegals, for a total of $15,288.90. Ex. 15 at 13. I find that the billing invoices reveal instances of duplicative review[21] and excessive use of internal communications.[22] Petitioner substituted MCT as counsel on April 3, 2017. By November 28,

---

[21] For example, attorneys billed for duplicative review of the record, paralegals and attorneys billed for duplicative review of ECF filings, and in one instance, Ms. Toale billed for duplicative review of the decision (on dates 12/05/2017 and 1/5/2018). *See* Ex. 15 at 1-13.

[22] The following billing entries reflect excessive invoicing for internal communications: 3/21/2017, 3/27/2017, 3/28/2017, 4/5/2017, 4/25/2017, 4/28/2017, 6/10/2017, 9/29/2017, 10/23/2017. I note that this is not an exhaustive list, but a mere sampling of the dates. *See* Ex. 15 at 1-13.

2017, less than eight months after MCT began representing Petitioner, Petitioner filed a motion for a decision dismissing her petition. MCT then proceeded to conclude proceedings and file for fees. In both 2017 and 2018, MCT assigned at least three attorneys and six paralegals to the matter, requiring at least three paralegals and at least two attorneys to continuously review and stay abreast of the case at any given time. It has been a long-standing practice in the Vaccine Program to reduce attorneys' fees for such similar duplicative billing entries. *See, Z.H. v. Sec'y of Health & Human Servs.*, No. 16-123V, 2018 WL 1835210, at \*3 (Fed. Cl. Spec. Mstr. Mar. 6, 2018) (reducing fees where "[m]ultiple attorneys reviewed the same orders and notifications and all billed time for doing so").

MCT acquired the case in order to assist Petitioner in obtaining a substantive expert review and dismissed the case within eight months. As such, I find it excessive for MCT to have assigned such a large team to this matter, requiring continuous duplicative review of the case status and records and ongoing internal communications between attorneys and paralegals to discuss the case. Moreover, both Ms. Toale and Ms. Wilson have extensive experience in this particular field. Ms. Toale has been practicing for over 25 years and has been practicing in this court for over 15 years. Ms. Wilson has a M.S. in Genetics and a Ph.D. in Molecular and Cellular Pharmacology. She has been practicing for seven years and, for the last five years, has been primarily representing petitioners in the Program. I find that this case was not so complex, nor was it in an advanced stage, such that two highly experienced attorneys were necessary throughout the pendency of the matter.

Furthermore, based on my review of the billing records submitted with Petitioner's Interim Motion (*see generally* Ex. 15), I also find that the MCT firm billed hours that I consider "excessive, redundant, or otherwise unnecessary." *Saxton*, 3 F.3d 1517 at 1521. Specifically, on several occasions, both attorneys and paralegals of MCT invoiced for completing administrative tasks such as updating case files, invoicing, completing retainer agreements, and mailing packages.[23] The professionals of the MCT firm also billed for frequent and excessive internal communications. Moreover, many of the billing entries also reflect instances of block billing, wherein the members of MCT billed for multiple tasks in a single entry, thus often comingling time that is not compensable with time that is compensable. For such entries, it is impossible to determine the precise portion of the time billed that should be compensated. I note that it is counsel's burden to document the fees claimed. *See Rodriguez v. Sec'y of Health & Human Servs.*, No. 06-559V, 2009 WL 2568468, at \*8 (Fed. Cl. Spec. Mstr. July 29, 2009); *see also Broekelschen v. Sec'y of Health & Human Servs.*, 2008 U.S. Claims LEXIS 399, at \*13-14 (Fed. Cl. Spec. Mstr. Dec. 17, 2008) (reducing a petitioner's attorneys' fees award and criticizing counsel in that case for block billing). Indeed, the Vaccine Program's *Guidelines for Practice* state as follows: "[e]ach task should have

---

[23] For example, the following billing entries reflect billing time for non-compensable administrative tasks such as: (1) updating internal databases: 3/16/2017, 3/24/2017, 4/3/2017, 4/17/2017, 4/20/2017, 5/4/2017, 5/5/2017, 5/8/2017, 5/10/2017; (2) processing retainer: 3/16/2017, 3/24/2017, 3/27/2017, 8/7/2017, 8/15/2017, 8/18/2017. *See* Ex. 15 at 1-13.

The billing entries mentioned above are examples and are not exhaustive; they provide a sampling of the many non-compensable administrative tasks billed by MCT.

its own line entry indicating the amount of time spent on that task.  Lumping together several unrelated tasks in the same time entry frustrates the court's ability to assess the reasonableness of the request."[24]

For these reasons, I will reduce the total award of MCT's requested attorneys' fees by 15%. This results in a reduction[25] of MCT's attorneys' fees award to **$12,995.57**.

Therefore, Petitioner is awarded attorneys' fees for MCT in the amount of **$12,995.57**.

### D.  Reasonable Attorneys' Costs for MCT

Petitioner requests a reimbursement of $3,259.02 in attorneys' costs for MCT. Ex. 16 at 1. The requested costs herein are for both expert costs and miscellaneous case costs.   I find the miscellaneous case costs to be reasonable and award them in full.

Petitioner retained MCT in order to assist in obtaining a substantive review by an expert of Petitioner's case.  MCT represented that Petitioner retained Dr. Seemant Chaturvedi. *See* Ex. 26. Dr. Chaturvedi reviewed the case and did not submit an expert report.  He invoiced $3,000, for six hours of review at a $500 hourly rate. Ex. 26 at 3.  Likely based on Dr. Chaturvedi's review of this matter, Petitioner subsequently dismissed her petition.

In examining the invoice and taking into account Dr. Chaturvedi's qualifications, expertise in applicable fields of study, and level of experience in the Program, I find Dr. Chaturvedi's requested rate to be higher than the usual rates awarded to new experts in the program.  In fact, even experts with significant experience in the Program are not awarded hourly rates higher than $500 per hour.  Moreover, I find it difficult to determine whether Dr. Chaturvedi should be paid at the highest rate paid to experts, given that no expert report or substantive review materials were filed. Accordingly, I will reduce Dr. Chaturvedi's hourly rate to $400, to reflect the lack of material filed and an inability to determine an appropriate rate based on quality of work produced.

Therefore, Petitioner is awarded attorneys' costs for MCT in the amount of **$2,659.02**[26], reflecting a reduction in expert rate.

---

[24] *Guidelines for Practice Under the National Vaccine Injury Compensation Program* ("*Guidelines for Practice*") at 67 (revised Nov. 5, 2018) found at:
https://www.uscfc.uscourts.gov/sites/default/files/18.11.05%20Vaccine%20Guidelines.pdf (last visited on March 27, 2018).

| [25] Attorneys' fees requested | = | $15,288.90 |
|---|---|---|
| **Percentage of reduction (15%)** | = | 0.85 |
| **Total** | = | **$12,995.57** |

| [26] Attorneys' Costs Requested | = | $3,259.02 |
|---|---|---|
| **Reduction of Dr. Chaturvedi's fee** | = | ($600) |
| **Total** | = | **$2,659.02** |

## VII.    Conclusion

Based on the foregoing, I hereby **GRANT IN PART** Petitioner's Motion for Attorneys' Fees and Costs.

I award a total of **$19,460.27** in attorneys' fees and costs as a lump sum in the form of a check jointly payable to Petitioner and Petitioner's original counsel of record, Mr. William P. Ronan, III, representing attorneys' fees in the amount of $18,558.00, plus costs in the amount of $902.27.

Additionally, I award a total of **$15,654.59** in attorneys' fees and costs as a lump sum in the form of a check jointly payable to Petitioner and Petitioner's current counsel of record, Ms. Amber Wilson, representing attorneys' fees in the amount of $12,995.57, plus costs in the amount of $2,659.02.

The clerk shall enter judgment accordingly.[27]

**IT IS SO ORDERED.**

**s/ Katherine E. Oler**
Katherine E. Oler
Special Master

---

[27] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.